**Enebiene P. IJOMA, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 4:CV93–3182.

United States District Court, D. Nebraska.

Jan. 18, 1995.

See also: 854 F.Supp. 612.

Enebiene P. Ijoma, pro se.

Thomas R. Hickey, Omaha, NE, for petitioner.

Paul W. Madgett, U.S. Atty., Omaha, NE, for respondent.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 33) and the objection to such Report and Recommendation (filing 35) filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the portions of the Report and Recommendation to which objections have been made.

Inasmuch as Judge Piester has fully, carefully and correctly found the facts and applied the law I need only state that the Report and Recommendation (filing 33) should be adopted and petitioner's objections to the Report and Recommendation (filing 35) should be denied.

IT IS ORDERED:

1. the Magistrate Judge's Report and Recommendation (filing 33) is adopted;

2. the petitioner's objections to the Report and Recommendation (filing 35) are denied; and

3. petitioner's petition is dismissed in all respects.

## MEMORANDUM, ORDER and RECOMMENDATION

PIESTER, United States Magistrate Judge.

Before the court for consideration is the petition for writ of habeas corpus filed by Petitioner Enebiene Ijoma. (Filing 1.) For reasons discussed more fully below, I shall recommend that the petition be denied.

## BACKGROUND

Petitioner is a native citizen of Nigeria who entered the United States on August 7, 1982 as a nonimmigrant student on "F–1 status." [1] On March 22, 1983 petitioner married a United States citizen. On August 15, 1983 petitioner's wife filed an immediate relative visa petition ("visa petition") on his behalf. (See filing 26, at 143–44.) [2] This visa petition was accompanied by petitioner's application for adjustment of status to a permanent resident ("adjustment application"). (*See id.* at 138–40.) [3] The respondent requested further documentation and initiated an investigation. A child was born to the couple September 3, 1983.

On August 8, 1984 petitioner pleaded *nolo contendere* on an insufficient fund check

1. Ijoma was admitted into the United States as a nonimmigrant student, which the Immigration and Nationality Act defines as

   an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study at an established college, university ... or other academic institution ... in the United States, particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education....

   8 U.S.C. § 1101(a)(15)(F)(i). An alien who is admitted under this provision is commonly referred to as having "F–1" status.

2. 8 U.S.C. § 1154 sets forth the procedure to be followed when immediate relative visa status is requested:

   After an investigation of the facts in each case, and after consultation with the Secretary of Labor with respect to petitions to accord a status under section 1153(b)(2) or 1153(b)(3) of this title, the Attorney General shall, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative specified in section 1151(b) of this title ... approve the petition and forward one copy thereof to the Department of State. The Secretary of State shall then authorize the consular officer concerned to grant the preference status.

8 U.S.C. § 1154(b). 8 U.S.C. § 1151(b) defines "immediate relatives" to include the spouses of United States citizens:

For purposes of this subsection, the term "immediate relatives" means the children, spouses, and parents of a citizen of the United States....

8 U.S.C. § 1151(b)(2)(A)(i). For an alien to qualify as an immediate relative "spouse" here the marriage with the United States citizen must be bona fide, and thus an immediate relative visa petition may be denied (or subsequently revoked) where it is found that a marriage is a "sham." See, e.g., *Horta–Ruiz v. INS*, 635 F.Supp. 1039 (S.D.N.Y.1986).

3. Under 8 U.S.C. § 1255(a), an alien may seek a change in his immigration status from a visitor to a permanent resident. Section 1255(a) provides:

   The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

   8 U.S.C. § 1255(a). Ijoma's wife presumably filed an immediate relative visa petition in an effort to satisfy subsections (2) and (3) of Section 1225(a).

charge in Lancaster County Court, Nebraska, and was fined $125.00. On February 6, 1985 petitioner pleaded *nolo contendere* on a no account check charge in the same court, and was fined $100.00. On May 5, 1986 petitioner was convicted of another insufficient fund check charge and sentenced to confinement for one year.

On May 26, 1986 respondent issued an Order to Show Cause why petitioner should not be deported under 8 U.S.C. § 1251(a)(4). Specifically, the Order alleged that petitioner's bad check convictions rendered him deportable under section 1251(a)(4) because the convictions were crimes "involving moral turpitude" for which petitioner had been sentenced to a year or more of imprisonment.[4] On October 8, 1986 petitioner began serving his one-year sentence. On June 11, 1987 petitioner was placed in respondent's custody after completing that sentence.

On June 12, 1987 respondent denied petitioner's visa petition on the basis that petitioner's marriage had been contracted solely for immigration purposes. (*See* filing 26, at 135–36.)[5] Petitioner did not appeal the denial. That same day respondent denied petitioner's adjustment application on the basis of: (1) no approved visa petition as required by 8 U.S.C. § 1255(a)(3);[6] and (2) petitioner's moral turpitude conviction.[7] (*See id.* at 134.) The denial of petitioner's adjustment application could not be appealed.[8]

Although deportation proceedings were initiated in Omaha, Nebraska, the case was transferred by a change in venue order August 12, 1987, changing venue to the Immigration Court in Denver, Colorado, as petitioner had been incarcerated in Aurora, Colorado. On September 14, 1987 petitioner's wife filed another immediate relative visa petition on petitioner's behalf. On September 16 deportation proceedings began in Denver. Since petitioner's second visa petition filed only two days earlier was still pending, the immigration judge told petitioner that he could not rule on that petition and continued the case to allow petitioner an opportunity to consult with his wife about the visa petition.

The deportation hearing recommenced September 23, 1987. At that time petitioner's second visa petition still had not been determined,[9] and in the interim respondent had lodged an additional Order to Show Cause against petitioner,[10] alleging that he had failed to maintain a condition of his status as a nonimmigrant student and was therefore deportable under 8 U.S.C. § 1251(a)(1)(C)(i) (West Supp.1993) (also referred to as Section 241(a)(9))[11] (*See id.* at 127.) The immigration judge rejected deportation on the basis of section 1251(a)(4) (crime involving moral turpitude), finding that the Nebraska statute underlying petitioner's second offense insufficient fund check conviction lacked the necessary lan-

---

**4.** 8 U.S.C. § 1251(a)(4) provides that:
Any alien who—(I) is convicted of a crime involving moral turpitude committed within five years after the date of entry, and (II) either is sentenced to confinement or is confined therefor in a prison or correctional institution for one year or longer, is deportable.

**5.** *See* note 2 *supra.*

**6.** *See* note 3 *supra.*

**7.** *See* note 4 *supra*

**8.** *See* 8 C.F.R. § 245.2(a)(5)(ii) (1991) ("No [administrative] appeal lies from the denial of an application [for an adjustment of status] by the district director, but the applicant retains the right to renew his or her application in [deportation] proceedings....").

**9.** This second immediate relative visa petition was subsequently denied on March 23, 1994, on the basis that the marriage was "one of conve-

nience entered into for purposes of obtaining permanent residence, rather than for maintaining a bona fide marital relationship." (Filing 31, at 2.)

**10.** The original Order to Show Cause filed May 26, 1986 under section 241(a)(4) of the Act, *see* note 4 *supra,* was still pending.

**11.** 8 U.S.C. § 1251(a)(1)(C)(i) provides that
Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status, is deportable.
Respondent argued that petitioner had failed to maintain his status as a full-time student—the condition attached to his nonimmigrant "F–1" status. *See* note 1 *supra.*

guage of allegation and proof of fraudulent intent. (*See id.* at 45–50.)

However, the judge sustained the deportation order on the basis of section 1251(a)(1)(C)(i), finding abundant evidence that while petitioner had attended "some school" since his admission to the United States, he had not remained a full-time student as required by his "F–1" nonimmigrant student status.[12] (*See id.* at 50–53.) Accordingly, the judge concluded that petitioner was not in compliance with the conditions under which he was admitted, and was deportable. The lodged charge for deportation was sustained. (*Id.* at 53–54.)

Petitioner appealed to the Board of Immigration Appeals ("BIA"). The BIA sustained the immigration judge's decision, concluding that petitioner was deportable under section 1251(a)(1)(C)(i) of the Act. (*See id.* at 9–11.)[13] Petitioner filed no appeal, but argues that he was never served with a notice and copy of the BIA decision and thus could not seek judicial review on either the deportation order itself or the denied status adjustment application which he also asked the board to reconsider. (*See* Petitioner's Brief, at 2–3.)

On May 28, 1993 petitioner filed a petition for writ of habeas corpus in this court. (Filing 1.) Petitioner appeared to challenge both his denied adjustment application and his order of deportation. In this court's first memorandum and order I noted that although petitioner had filed his action on a printed 28 U.S.C. § 2254 form, I would consider his claims under § 1105(a), as raised under 28 U.S.C. § 2241 habeas jurisdiction. (*See* Filing 6.)

Respondent later filed a motion to dismiss for lack of jurisdiction. (Filing 16.) In filing 18 I concluded that to the extent petitioner was seeking review of his deportation order his relief was solely within the jurisdiction of the court of appeals under 8 U.S.C. § 1105(a) and that he was time-barred from such relief.[14] I further concluded that this court had jurisdiction under 8 U.S.C. § 1329 and 28 U.S.C. § 1331(a) to review the denial of his adjustment application. *Cf. Daneshvar v. Chauvin*, 644 F.2d 1248, 1251 (8th Cir.1981) (habeas corpus relief under 8 U.S.C. § 1105a(a)(9) is available to review the denial of discretionary relief to an alien where the matter of deportability itself is not an issue). I therefore recommended that respondent's motion to dismiss be denied, and Judge Kopf subsequently adopted that recommendation. (*See* Filing 22.) Thus, my review here is limited to the denial of petitioner's adjustment application.

## DISCUSSION

■ This court's review of respondent's denial of petitioner's adjustment application is governed by whether that decision was the result of an abuse of discretion. *Rashtabadi v. I.N.S.*, 23 F.3d 1562, 1566 (9th Cir.1994); *Nowak v. Moyer* (unreported decision), 1994 WL 445219, at * 2 (N.D.Ill.1994); *Ajurulloski v. I.N.S.*, 688 F.Supp. 1272, 1276 (N.D.Ill. 1988); *cf. Choi v. I.N.S.*, 798 F.2d 1189, 1191 (8th Cir.1986) (change in treaty investor status within the discretion of the INS will only be disturbed if arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law). An abuse of discretion will be found only if there is no evidence to support a decision or if a decision is based upon an improper understanding of the law. *Bothyo v. Moyer*, 772 F.2d 353, 355 (7th Cir.1985). In making this assessment, I consider only the evidence petitioner submitted to the agency. *Ajurulloski*, 688 F.Supp. at 1276 n.

---

12. *See* note 1 *supra.*

13. In addition to the immigration judge's finding that petitioner had failed to maintain his full-time student status for taking too few credit hours, the BIA further noted that petitioner's bad check conviction (even if did not involve moral turpitude) meaningfully disrupted petitioner's studies so as to render him deportable for failing to maintain the full-time status necessary for "F–1" nonimmigrant student status. *See* note 1 *supra.*

14. Deportation orders and the issue of deportability itself are properly before a federal court of appeals on review. *See Bae v. I.N.S.*, 706 F.2d 866, 869 (8th Cir.1983). 8 U.S.C. § 1105a(a)(1) provides that "a petition for review may be filed not later than 90 days after the date of the issuance of the final deportation order." Ijoma's deportation order was issued December 26, 1991, the date of the order of the BIA decision. Ijoma filed this habeas petition May 28, 1993, well beyond the 90–day limit.

8. However, I must evaluate the agency's treatment of that evidence, particularly whether it considered all relevant facts available in the administrative record as a whole. *Choi*, 798 F.2d at 1191.

■ Petitioner's adjustment application was denied on the bases of: (1) no approved visa petition as required by 8 U.S.C. § 1255(a)(3); and (2) petitioner's moral turpitude convictions. Under 8 U.S.C. § 1255(a) the Attorney General has discretion to grant an adjustment of status where an alien applicant meets certain statutory requirements. The statutory requirement of particular relevance here is that the alien must be eligible to receive an immigrant visa, and "an immigrant visa [must be] immediately available to him at the time his application is filed." [15] In the present case it is clear that when petitioner filed his adjustment application August 15, 1983 he had no immigrant visa "immediately available to him." Rather, that same day petitioner's wife filed on petitioner's behalf an immediate relative visa petition—essentially an *application* for a visa. (*See* filing 26, at 143–44.) That visa petition and the adjustment application were both subsequently denied on June 12, 1987. Thus, petitioner was not even statutorily eligible for a favorable exercise of Attorney General discretion on the basis of the "sham" marriage.[16]

■ Petitioner also challenges this "sham" marriage finding. *Cf. Horta–Ruiz v. INS*, 635 F.Supp. 1039, 1040 (S.D.N.Y.1986) (federal district court review of denial of immediate relative visa application proper as a matter ancillary to deportation orders). In denying petitioner's visa petition the INS stated:

On August 15, 1983, you [petitioner's wife] filed a petition on behalf of the beneficiary, Enebiene Ijoma, seeking to classify him as an immediate relative based upon your marriage to him on March 23, 1983.

The record reflects, according to your statements made to a third agency, that the beneficiary was absent from the United States from March 29, 1983 (less than one week after your marriage) until October 15, 1983. In May, 1984, you separated from your husband and applied for ADC assistance based on his absence and your lack of financial support. This assistance continued through 1985. In May 1986, you filed for divorce from the beneficiary, and in October 1986, he was incarcerated and remains incarcerated now.

It is obvious from all of the above that the marriage is a contrived one and contracted solely primarily for the purpose of obtaining a benefit for the beneficiary to which he is not otherwise entitled. *In Matter of Brantigan,* 11 I & N 493, (BIA, 1966), it was determined that the burden of proof to establish eligibility for a benefit rests with the petitioner. In this instance, that burden has not been met.

The petition is therefore, denied.

(Filing 26, at 136.) There is no record that petitioner or his wife appealed the denial, although the availability of such appeal was clearly printed on the visa denial decision. (*Id.* at 135.)

■ Petitioner argues that the INS' conclusion that his marriage was contracted solely for immigration purposes is invalid, since the marriage was recognized as valid under Nebraska law and was not a "sham or fraudulent at its inception," citing *Dabaghian v. Civiletti,* 607 F.2d 868 (9th Cir.1979) (Petitioner's Brief, 6–7.) I must disagree. The Ninth Circuit has persuasively argued:

Aliens cannot be required to have more conventional or more successful marriages than citizens. . . . Evidence that the parties separated after their wedding is relevant in ascertaining whether they intended to establish a life together when they exchanged marriage vows. But evidence of separation, standing alone, cannot support a finding that a marriage was not bona fide when it was entered. The inference that the parties never intended a bona fide marriage from proof of separation is arbitrary unless we are reasonably assured that it is more probable than not that couples who separate after marriage never

15. *See* note 3 *supra.*

16. *See* notes 2 and 5 and accompanying text *supra.*

intended to live together.... Common experience is directly to the contrary. Couples separate, temporarily and permanently, for all kinds of reasons that have nothing to do with any preconceived intent not to share their lives, such as calls to military service, educational needs, employment opportunities, illness, poverty, and domestic difficulties.

*Bark v. INS,* 511 F.2d 1200, 1201–02 (9th Cir.1975) (as quoted in *Dabaghian,* 607 F.2d at 869–70). While I agree that "evidence of separation, standing alone," is insufficient to prove a sham marriage, the evidence referred to by the INS in denying petitioner's visa petition, while not dispositive, preponderates toward the conclusion that petitioner's marriage was not intended to be *bona fide* at its inception.[17] As such, I cannot conclude that the Director abused his discretion in denying petitioner's adjustment application for lack of an "immediately available" visa petition (because of a "sham" marriage).

■ Nor was the alternative basis for denying the visa petition—petitioner's moral turpitude conviction[18]—an abuse of discretion. The question is whether an insufficient fund or "bad check" conviction is a crime "involving moral turpitude" within the meaning of 8 U.S.C. § 1251(a)(4). Notwithstanding the immigration law judge's conclusion to the contrary,[19] I conclude that it is. "Without exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude." *Jordan v. DeGeorge,* 341 U.S. 223, 227–232, 71 S.Ct.

703, 706–709, 95 L.Ed. 886 (1951) (conspiracy to defraud United States of taxes on distilled spirits was a "crime involving moral turpitude" under 8 U.S.C.A. § 155(a) (forerunner to 8 U.S.C. § 1251(a)(4)). The Nebraska Supreme Court is clear that to violate § 28–611(3) an intent to defraud must exist at the time one issues an insufficient-fund check. *See State v. Hruza,* 223 Neb. 837, 841 (1986). Accordingly, petitioner's insufficient fund convictions are properly characterized as crimes "involving moral turpitude" within the meaning of 8 U.S.C. § 1251(a)(4). *See Burr v. Immigration and Naturalization Service,* 350 F.2d 87, 91–92 (9th Cir.1965), *cert. denied,* 383 U.S. 915, 86 S.Ct. 905, 15 L.Ed.2d 669 (1966). Other decisions lend persuasive support to that conclusion.[20]

Since petitioner's last insufficient fund conviction constituted a crime "involving moral turpitude" within the meaning of 8 U.S.C. § 1251(a)(4), and petitioner was sentenced to incarceration for one year as a result, the Director did not abuse his discretion in denying petitioner's adjustment application on that basis. As neither of the bases for denying petitioner's adjustment application was an abuse of discretion, I shall recommend that this petition be denied.

**IT THEREFORE HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, that the petition for writ of habeas corpus be denied.

Petitioner is hereby notified that unless objection is made within ten days after he is

---

**17.** This evidence demonstrates the continued and suspicious absence of petitioner from the household as well as an absence of financial support. *See generally* filing 26, at 167–216.

**18.** *See* note 4 and accompany text *supra.*

**19.** I reiterate that the immigration law judge's conclusions were rendered in the deportability proceeding, not in the denial of adjustment, and the deportability proceeding is not before this court for review. *See* note 14 and accompanying text *supra.*

**20.** *See Portaluppi v. Shell Oil Co.,* 684 F.Supp. 900, 906 (E.D.Va.1988), *aff'd* 869 F.2d 245 (4th Cir.1989) (writing a bad check would be a "crime involving moral turpitude" for purposes of justifiable termination under the federal Petroleum Marketing Practices Act and the Virginia Petroleum Products Franchise Act); *Rochester v.*

*United States,* 291 F.Supp. 323, 328 (M.D.Ala. 1968) (dicta that a bad check is a crime "involving moral turpitude"); *Application of Stapley,* 246 F.Supp. 316, 318 (D.Utah 1965) (charges of fraud involving bad checks in special court-martial proceedings were substantial, involved moral turpitude, and could result in substantial deprivation of liberty and were thus within scope of Sixth Amendment right to counsel); *United States v. Hutchins,* 19 C.M.R. 143, 145 (1955) (bad check offenses involve moral turpitude); *but see In re Gonzalez Seijo,* 76 B.R. 11, 14 (Bankr.D.Puerto Rico 1987) (under Bankruptcy Code, debtor's issuance of postdated check did not, in itself, constitute intent to defraud for showing of moral turpitude or intentional wrong for purposes of dischargeability of debt); *In re Tingley,* 37 B.R. 466 (Bankr.S.D.Fla.1984) (same).

served with a copy of this recommendation, he may be held to have waived any right he may have to appeal the court's order adopting this recommendation.

Dated November 30, 1994.